1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

N.D., et al.,

　　　　　　　　　Plaintiffs,

　　　v.

CHRIS REYKDAL, et al.,

　　　　　　　　　Defendants.

CASE NO. 2:22-cv-01621-LK

ORDER GRANTING IN PART
AND DENYING IN PART
MOTION FOR
RECONSIDERATION

　　　　This matter comes before the Court on Plaintiffs' Motion for Reconsideration, Dkt. No. 60, of the Court's Order denying Plaintiffs' motion for provisional class certification and for a preliminary injunction, Dkt. No. 58 (the "Order").[1] At the Court's request, Defendants filed a response to the motion for reconsideration. Dkt. Nos. 62, 66. The Court also held a hearing on the motion on September 26, 2023. Dkt. No. 69. Having considered the motion, the response, the parties' arguments at the hearing, and the balance of the record, the Court grants the motion in part insofar as it has fully reconsidered its decision, but upon such reconsideration, the Court reaches

---

[1] After Plaintiffs filed this motion, the Ninth Circuit Court of Appeals issued an order holding Plaintiffs' appellate proceedings "in abeyance until the district court decides the pending motion." Dkt. No. 64 at 1.

the same result. *Pena-Ruiz v. Solorzano*, 281 F. App'x 110, 111 n.1 (3d Cir. 2008) (a motion for reconsideration is considered "granted" when the district court "thoroughly reconsider[s] its previous ruling," even if it reaches the same outcome).

## I.   BACKGROUND

The factual background set forth in the Order, Dkt. No. 58 at 2–9, is reproduced in part below for ease of reference.

At issue in this case is whether Washington's law that ends special education services at the end of the school year during which a student turns 21 violates the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The IDEA requires states to provide a "free appropriate public education" ("FAPE") to all individuals with disabilities residing in the state "between the ages of 3 and 21, inclusive[.]" 20 U.S.C. § 1412(a)(1)(A). As a result, students' "eligibility for IDEA services ordinarily ends on [their] twenty-second birthday." *E.R.K. v. State Dep't of Ed.*, 728 F.3d 982, 986 (9th Cir. 2013). However, the statute includes an exception: a state's duty to provide a FAPE to students with disabilities does not extend to individuals aged 3 through 5 or 18 through 21 "to the extent that [the duty's] application to those children would be inconsistent with State law or practice . . . respecting the provision of public education to children in those age ranges[.]" 20 U.S.C. § 1412(a)(1)(B)(i). Washington law does not require provision of public education through a student's twenty-second birthday; instead, each school district is required "to insure an appropriate educational opportunity for all children with disabilities between the ages of three and *twenty-one*," and if "the twenty-first birthday occurs during the school year, the educational program may be continued until the end of that school year." Wash. Rev. Code § 28A.155.020 (emphasis added); *see also* Wash. Admin. Code § 392.172A.02000(2)(c).[2]

---

[2] State law defines "school year" as "the annual period commencing on the first day of September of one calendar

In *E.R.K*, the Ninth Circuit addressed the above-mentioned IDEA exception and held that states "cannot deny special education to disabled students aged 18 through 21 if it in fact provides 'free public education' to nondisabled students in that range of ages." 728 F.3d at 987. Plaintiffs argue that Washington provides nondisabled students who are 21 years or older free secondary education through two adult education programs described below. Dkt. No. 35 at 18–20. Defendants do not dispute that the programs are secondary education, but dispute that they are provided without charge. Dkt. No. 36 at 15–16.

A.   **Washington's Education System**

1.   <u>Washington's Special Education Services</u>

The Office of Superintendent of Public Instruction ("OSPI") is a named Defendant and the primary state agency charged with overseeing public K–12 education in Washington, working with 295 school districts across the state. Dkt. No. 40 at 2. Washington provides special education and related services to over 140,000 eligible students. *Id.* at 1.

Special education services include "a wide range of services depending on the particular needs of the individual enrolled students[.]" *Id.* at 2. Specialized services may include speech-language assistance, occupational or physical therapy, assistance from a paraeducator, and adaptive or assistive technology. *Id.*

The specific services each student will receive, their academic and functional goals, and the expectations for the school year are set forth in their individualized education program ("IEP"). *Id.* at 2–3. An IEP is created and implemented by the student's unique IEP team. *Id.* at 3. Required members of the team include the student's parent(s) or guardian(s), at least one of the student's general and special education teachers, a qualified representative of the school district, and an

---

year and ending the last day of August of the ensuing calendar year[.]" Wash. Admin. Code § 392.121.031. Therefore, the current school year ends on August 31, 2023.

individual who can interpret the instructional implications of evaluation results. *Id.* The IEP must contain certain required elements, including the student's present academic achievement/performance, measurable annual goals, a statement of special education services to be provided, extended school year services if necessary, and a post-secondary transition plan if the student will be turning 16 or older during the IEP (or younger if appropriate). *Id.*[3]

2. <u>Washington's Secondary Education Programs</u>

Washington has created a system of community and technical colleges that provide "continuing higher education," "occupational education and training," and "adult basic skills and literacy education." Wash. Rev. Code § 28B.50.020. The community and technical colleges may issue high school diplomas or certificates to individuals who meet statutory criteria. *Id.* § 28B.50.535.

The community and technical colleges are overseen by the Washington State Board for Community and Technical Colleges ("SBCTC"). *Id.* § 28B.50.030(6) (defining the "College board" to mean "the state board for community and technical colleges created by this chapter"); *id.* § 28B.50.090 (defining powers and duties of the College board). SBCTC supervises and monitors two basic education for adults ("BEdA") programs that Plaintiffs contend constitute free secondary education. Dkt. No. 35-3 at 9; Dkt. No. 35 at 19–20.

One such program, High School + ("HS+") is "the state's competency-based high school diploma program" for students who are at least 18 years old. Dkt. No. 35-3 at 10; *id.* at 27. HS+ "renders a high school diploma" that is the same as those awarded by the state's secondary schools.

---

[3] Some students who need special education services between the ages of 18 and 21 receive those services through the state's BRIDGES Transition program, which focuses on "personal living skills, employability, daily and community living, functional academics, and connection with the agencies that are available to assist students once they exit the District." Dkt. No. 38 at 4. IEP teams also link those students with "adult-service agencies and employment opportunities." *Id.*

*Id.* at 11, 15–16. SBCTC monitors to ensure "that the high school diplomas being awarded by the 34 colleges meet the requirements stated in [the] statute[.]" *Id.* at 13. The HS+ program "is offered by the state's community and technical colleges, often in partnership with community-based organizations." *Id.* at 27.

SBCTC also oversees the community and technical colleges' preparation classes for the state's General Education Development ("GED") exam. *Id.* at 13. Successful passage of the GED exam results in a high school equivalency certificate. *Id.* at 14; Wash. Admin. Code § 131-48-030. Individuals who are at least 16 years old may participate in the BEdA GED preparation classes, but if they are under 19, they must be formally released from high school before participating. Dkt. No. 35-3 at 50.

Of particular relevance here, the community and technical colleges charge tuition of $25 per quarter for the HS+ and GED programs. *Id.* at 18. Each college is required to have a process and criteria to waive the tuition. *Id.* at 20–21. Under that rubric, the HS+ and GED programs "can be offered free of charge if the student asks for and qualifies for a waiver." *Id.* at 22; *id.* at 27 ("Many students qualify for waivers" of the $25 tuition). Defendants do not allege, and there is no evidence in the record, that either the HS+ or the GED programs provide IEP services to students with disabilities.

**B.    Plaintiff N.D. Files a Complaint**

Plaintiff N.D., by and through his parents and guardians, filed a class action complaint for declaratory and injunctive relief in November 2022 against Defendants OSPI and Chris Reykdal in his capacity as the Superintendent of Public Instruction. Dkt. No. 2-1. N.D. was eligible for special education services because he has Autism. *Id.* at 4.

The complaint alleged that N.D. "was denied his right to a continued FAPE as required under federal law by the IDEA until his 22nd birthday solely because he had exceeded

1   [Washington's] age cutoff[.]" *Id.* at 2. Specifically, N.D. "moved from an out-of-state residential

2   school, where he had been placed on an IEP by Seattle Public Schools since 2017, to an adult

3   residential placement in Kirkland after Seattle Public Schools terminated educational services to

4   him on August 31, 2022[.]" *Id.* at 3. Plaintiffs further allege that "[h]ad N.D. not been improperly

5   denied a FAPE as of August 31, 2022, he would have continued to reside in Seattle and receive

6   educational services through Seattle Public Schools." *Id.*

7   **C.     The Complaint Is Amended to Add Plaintiff E.A.**

8        In March 2023, N.D. filed a motion for leave to file an amended complaint, which the Court

9   granted. Dkt. Nos. 22, 27. The amended complaint added an additional named plaintiff, E.A., by

10  and through his parents and guardians. Dkt. No. 31 at 1–2.

11       Plaintiff E.A. is an individual with a disability (Autism) who turns 21 in August 2023. *Id.*

12  at 3, 5; Dkt. No. 35-1 at 1. He had been receiving a FAPE through the Selah School District,

13  including one-on-one support from a paraeducator, but such special education services ended with

14  the close of the school year on August 31, 2023. Dkt. No. 31 at 3; Dkt. No. 39 at 2. The amended

15  complaint alleges that E.A. "would meaningfully benefit from additional special education and

16  related services, including extended school year services (ESY) under the IDEA until his 22nd

17  birthday in summer 2024." Dkt. No. 31 at 4.

18       E.A.'s mother states that he "suffered extraordinary regression during the COVID-19

19  related school closures" based on the loss of his routines and in person instruction. Dkt. No. 35-1

20  at 2. He lost "significant communication skills" and regressed academically. *Id.* at 3. Once he

21  returned to in person school, "[i]t took months of services" to return him to "where he had been

22  emotionally, behaviorally, and academically[.]" *Id.*[4] His mother believes that E.A. "will

23  _____

24  [4] During the 2020-2021 school year, E.A. was in the school building the majority of the time with his dedicated
    paraeducator and attending classes by Zoom, while his peers attended only through Zoom. Dkt. No. 37-1 at 90.

experience something similar once he is exited from special education." *Id.*

The amended complaint seeks declaratory and injunctive relief as well as "compensatory education to Plaintiffs N.D., E.A., and members of the Plaintiff Class to the extent they have already been unlawfully denied a FAPE[.]" Dkt. No. 31 at 13–14. In addition to the injunctive relief described below, Plaintiffs seek a declaration that Defendants have violated the IDEA and that "Wash. Rev. Code § 28A.155.020 and Wash. Admin. Code § 392.172A.02000 are invalid as contrary to the IDEA to the extent they do not ensure eligible students receive a FAPE until they turn 22[.]" *Id.* at 14.

**D.      Plaintiffs File a Motion for a Preliminary Injunction**

On May 10, 2023, Plaintiffs filed a Motion for Provisional Certification and Preliminary Injunction. Dkt. No. 35. They requested that the Court certify a provisional class defined as:

> All individuals who will be twenty-one on August 31, 2023, and who are at that time being provided special education services pursuant to an individualized education program ("IEP") implemented by any local educational agency ("LEA") in Washington.

Dkt. No. 35-6 at 1.[5] They also sought an order enjoining Defendants "from allowing any LEA subject to their supervision to terminate IEP services for any member of said provisionally certified class by reason of said class member's age prior to said class member having reached age twenty-two" and requiring them "to take all actions necessary to ensure that each said class member to whom the Court's injunction extends continues to receive IEP services until the earlier of the resolution of this litigation or said class member reaches the age of twenty-two." Dkt. No. 35-6 at 1–2.

On August 31, 2023, the Court denied Plaintiffs' motion for a preliminary injunction, holding that they had failed to carry their "doubly demanding" burden of establishing not simply

---

[5] This differs from the class definitions in Plaintiffs' complaint and in their separate motion for class certification.

that they are likely to succeed on the merits, but that the law and facts clearly favor their position. Dkt. No. 58 at 17–19. The Court denied as moot Plaintiffs' request for provisional certification of an injunctive class. *Id.* at 19. Plaintiffs then moved for reconsideration. Dkt. No. 63-1.

## II.   DISCUSSION

### A.   Applicable Legal Standards

Plaintiffs seeking a preliminary injunction must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the Court held in the Order, Plaintiffs must meet a "doubly demanding" burden because they are seeking a mandatory injunction. Dkt. No. 58 at 16–17 (quoting *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). The Order found that Plaintiffs had not met their burden of establishing a likelihood of irreparable harm, *id.* at 17, and because the failure to establish one of the *Winter* prongs is fatal to a motion for preliminary injunctive relief, the Court did not address the remaining elements. *Id.* at 19.

Plaintiffs argue that the Court erred in finding that they had not established a likelihood of irreparable harm and in concluding that they are not entitled to a preliminary injunction. *See generally* Dkt. No. 60. Motions for reconsideration are disfavored, and the Court "will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." LCR 7(h)(1); *see also Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (noting that reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources" (cleaned up)); *Barton v. LeadPoint Inc.*, No. C21-5372-BHS, 2022 WL 293135, at *1 (W.D. Wash. Feb. 1, 2022) (motions

1   for reconsideration are not "intended to provide litigants with a second bite at the apple" and

2   "should not be used to ask a court to rethink what the court had already thought through").

3   Furthermore, movants are required to "point out with specificity the matters which the movant

4   believes were overlooked or misapprehended by the court, any new matters being brought to the

5   court's attention for the first time, and the particular modifications being sought in the court's prior

6   ruling." LCR 7(h)(2). Failure to do so "may be grounds for denial of the motion." *Id.*

7        Because Plaintiffs' argument that they are entitled to an injunction presupposes that they

8   have established a likelihood of success on the merits and the other *Winter* factors, the Court

9   addresses all four factors.

10  **B.    Likelihood of Success on the Merits**

11       The parties' dispute over the likelihood of success turns on one issue: whether Washington

12  provides public education to adults over the age of 21 "without charge." Dkt. No. 36 at 15 (citing

13  *E.R.K.*, 728 F.3d at 987). This distinguishes it from almost all the other cases addressing 20 U.S.C.

14  § 1412(a)(1)(B)(i), as the dispositive issue in those cases was whether the state's adult education

15  programs constituted "public education." *See, e.g.*, *E.R.K.*, 728 F.3d at 984; *A.R. v. Connecticut*

16  *State Bd. of Educ.*, 5 F.4th 155, 159 (2d Cir. 2021); *K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d

17  639, 641 (1st Cir. 2018).

18       Here, the parties do not dispute that Washington provides public education to adults. Dkt.

19  No. 34 at 6.[6] It is also undisputed that the HS+ and GED programs charge tuition of $25 per

20  quarter. Dkt. No. 35 at 21; Dkt. No. 36 at 15; Dkt. No. 35-3 at 18, 27, 50. Tuition waivers for the

21  HS+ and GED programs are available for students who qualify; 37%, 38%, and 42% of students

22

---

23  [6] Specifically, the parties do not dispute that the two programs at issue, the HS+ and GED programs, constitute
    secondary education provided at public expense and under public supervision and direction. "[H]igh school diploma
24  programs are paradigmatic examples of secondary education[.]" *E.R.K.*, 728 F.3d at 989 n.5; *see also* Dkt. No. 35-3
    at 25 ("Secondary education is one of the core services that basic education for adults through SBCTC provides.").

1    received tuition waivers for the 2019-2020, 2020-2021, and 2021-2022 school years, respectively.

2    Dkt. No. 35 at 20–21; Dkt. No. 36 at 16; Dkt. No. 35-3 at 53–55; *see also id.* at 18, 20–21, 27, 50.

3           Plaintiffs argue that the programs are provided "without charge" within the meaning of 20

4    U.S.C. § 1412(a)(1)(B)(i) because (1) $25 is a nominal amount; (2) "[t]he $25 is wholly retained

5    by the college, with none of that money returning to the state"; (3) "the community colleges do

6    not need to spend the $25 on instruction—the money must merely be 'reinvested' in the program";[7]

7    and (4) many colleges waive the tuition for students who are unable to pay. Dkt. No. 35 at 20–21

8    (citing Dkt. No. 35-3 at 19:3–6, 23:1–25, 50). While the majority of students pay the tuition,

9    Plaintiffs argue that the tuition is still "free" within the meaning of 1412(a)(1)(B)(i) because it is

10   not charged to "all adults *without exception*[.]" Dkt. No. 35 at 20 (emphasis original); *see also* Dkt.

11   No. 42 at 13 ("On its face, this [free public education] test is met if a state provides "free public

12   education" to *any* [nondisabled] students.").[8] During the hearing, Plaintiffs also argued that if the

13   state subsidizes adult education at any level, the education is "free" for purposes of Section

14   1412(a)(1)(B)(i). Rough Tr. of 9/26/2023 Hrg. (hereinafter "Rough Tr.") at 36 ("if the State

15   devotes public money to providing secondary education to nondisabled adults, it has got to educate

16   disabled people until age 22"); *id.* at 40 ("If you're providing any amount of free education to

17   nondisabled students . . . up to age 22, then you've got to do that for all disabled students."). Under

18   this theory, charging 21-year-old students $100 each in tuition (without any tuition waivers) for an

19   education program that costs the state $500 is "free" public education such that it would trigger a

20   state's obligation to provide a FAPE to disabled students. *Id.* at 38–39.

21

22   [7] For example, the funds "could be used to purchase supplies" or "to fund wraparound services for students" such as
     paying for a bus pass or textbook. Dkt. No. 35-3 at 23.

23   [8] The Court notes that in response to a question at the hearing asking whether education would be "free" where "the
     State charged $500 for these programs to every single student except for perhaps 1 percent that satisfied a very high
24   threshold for financial aid," Plaintiffs responded that they did not know the answer to that question, and that a $500
     tuition would not be the "truly nominal" tuition at issue here. Rough Tr. at 13–14.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RECONSIDERATION - 10

1    The Court's analysis starts with the statutory text. Under 20 U.S.C. § 1412(a)(1)(A)–(B)(i),

2    a state receiving IDEA funds maintains eligibility to continue receiving such funds by giving "[a]

3    free appropriate public education . . .  to all children with disabilities residing in the State between

4    the ages of 3 and 21"; provided, however, that the State's "obligation to make a free appropriate

5    public education available to all children with disabilities" does not apply with respect to children

6    aged 18 through 21 "to the extent that its application to those children would be inconsistent with

7    State law or practice . . . respecting the provision of public education to children in those age

8    ranges."[9] Finding the latter language "not completely pellucid," the Ninth Circuit interpreted it "to

9    mean that [a state] cannot deny special education to disabled students aged 18 through 21 if it in

10   fact provides 'free public education' to nondisabled students in that range of ages." *E.R.K.*, 728

11   F.3d at 986–87. This interpretation drew from the Senate Report accompanying the 1975 statute,

12   which explained that the exception in 20 U.S.C. § 1412(a)(1)(B)(i) does not apply "where a state

13   does now in fact provide or assure the provision of free public education to non-handicapped

14   children in these age groups." *Id.* (quoting S. Rep. No. 94–168, 1975 U.S.C.C.A.N. 1425, 1442–

15   43 (1975)). "[A] 'free public education' is one that is 1) provided at public expense, under public

16   supervision and direction, and without charge; and 2) involves preschool, elementary, or secondary

17   education." *Id.* ("'Free' means 'without charge.'"); *see also* 20 U.S.C. § 1401(9)(A).

18   As Defendants note, *E.R.K.* did not address whether the availability of tuition waivers,

19   scholarships, or financial aid renders an education program "free" for purposes of the IDEA. Dkt.

20   No. 36 at 15. Nor did *E.R.K.* hold that schools must "charge all adults *without exception*," as

21   Plaintiffs contend. Dkt. No. 35 at 20 (emphasis original); *see also* Dkt. No. 42 at 13. The issue in

22

23   _____
[9] *See also* 34 C.F.R. § 300.102 ("The obligation to make FAPE available to all children with disabilities does not

24   apply" to children aged 18 through 21 "to the extent that its application to those children would be inconsistent with State law or practice . . . respecting the provision of public education to children of those ages.")

the case was whether "state-funded high school diploma programs for adults who never graduated from high school [are] a form of 'public education,'" and "neither party dispute[d]" on appeal that the adult education programs at issue were "provided at public expense and [we]re free to students." *E.R.K.*, 728 F.3d at 984, 988.[10] However, *E.R.K.* did set forth the applicable test: Does Washington State "in fact provide[] 'free public education' to nondisabled students [between 18 and 21]"? *Id.* at 987.

As discussed above, the default rule in Washington is that students pay $25 tuition, and roughly 40% of students qualify for a tuition waiver each year. Inability to pay is the only criterion in the record for such a waiver. Dkt. No. 31 at 10; Dkt. No. 35-3 at 20–22.[11] Individuals are not entitled to a tuition waiver merely because they are members of the public aged 18 through 21. Dkt. No. 31 at 10 ("SBCTC . . . allows colleges the flexibility to waive the $25 charge for students who cannot pay."); Dkt. No. 35-3 at 22. Thus, providing tuition waivers to qualifying individuals does not render HS+ or GED programs "free" to the public. In other words, based on the limited record currently before the Court, the state does not in fact "provide or assure the provision of" free education to nondisabled members of the public who may enroll in those programs. *E.R.K.*, 728 F.3d at 987. Nor is there any evidence in the record that Defendants are attempting to "escape the obligation of parity" by pretextual means. *K.L.*, 907 F.3d at 652 n.12.

As the Court noted during the hearing, Plaintiffs' argument that any level of state subsidy for public education offered to adults up to age 22 renders the education "free" conflates the inquiry regarding what is "free" with the inquiry regarding what is "public." Rough Tr. at 16, 38. As the

---

[10] Following a bench trial, the district court found that "[a]lthough students are charged nominal fees for books, testing, and other miscellaneous expenses, the programs are tuition free and almost entirely funded by state and federal funds." *R.P.-K ex rel. C.K. v. Dep't of Educ., Hawaii*, No. 10–00436DAE–KSC, 2012 WL 1082250, at 1, 3 (D. Haw. Mar. 30, 2012).

[11] The colleges are required to establish a process and criteria to issue waivers. Dkt. No. 35-3 at 20–21.

Ninth Circuit observed in *E.R.K.*, "a 'free public education' is one that is . . . provided at public expense, under public supervision and direction, *and without charge*." 728 F.3d at 988 (emphasis added); *see also* 20 U.S.C. § 1401(9)(A) (providing in part that "'free appropriate public education' means special education and related services that . . . [1] have been provided at public expense, [2] under public supervision and direction, and [3] without charge"). Because "'[f]ree' means 'without charge,'" *E.R.K.*, 728 F.3d at 988, it follows that whether education is provided "at public expense" and "under public supervision and direction" bears on whether it is "public." If whether education is "provided at public expense" were the only relevant inquiry, as Plaintiffs urge, Rough Tr. at 36, 40, there would be no need to evaluate whether the education is "without charge." And although Plaintiffs argue that the $25 tuition is nominal and does not meaningfully defray the cost of providing the programs, Rough Tr. at 36, there is no evidence in the record about how much it costs the state to provide the programs. The Court cannot simply assume that the tuition charged is disproportionate to those costs.

Furthermore, under Plaintiffs' theory that Washington's approach to its GED and HS+ programs constitutes provision of a "free public education," "free" has different meanings for purposes of Section 1412(a)(1)(A) and Section 1412(a)(1)(B)(i). Again, Plaintiffs argue that for purposes of Section 1412(a)(1)(*B*), the $25 tuition is "free" because, among other things, (1) it is a nominal amount; (2) the state does not retain the tuition revenue; and (3) the colleges can reinvest the tuition revenue into the programs. Dkt. No. 35 at 20–21. Applying this definition of "free" to Section 1412(a)(1)(*A*), Washington could charge a $25 tuition to all children aged 3 through 21 under any of these circumstances without violating that section's requirement to provide a "free" appropriate public education to any such children with disabilities. But Plaintiffs averred at the hearing that none of these would be "free" for purposes of Section 1412(a)(1)(A). Rough Tr. at 9–11.

1   With respect to Plaintiffs' argument that the programs are "free" because some of the

2   tuition funds are "reinvested" to "support" the programs, Dkt. No. 35 at 20; Dkt. No. 35-3 at 23,

3   at this point, the record does not show how much of the tuition is used that way, how often, the

4   requirements—if any—for providing that support, or that the tuition is merely a pretext to pass the

5   funds back to students through supplies and the like. Furthermore, the tuition is charged on top of

6   "additional fees" that "some colleges charge." Dkt. No. 35-3 at 18. Therefore, unlike in *R.P.-K*,

7   the adult education programs at issue are not "tuition free" and the money charged represents

8   tuition rather than "nominal fees" for books, testing, and other miscellaneous expenses. *R.P.-K*,

9   2012 WL 1082250, at *3.

10   For the reasons explained above, on the current record Plaintiffs have not established that

11   they are likely to succeed in showing that the IDEA's requirement that states provide a FAPE to

12   disabled students until their twenty-second birthday is consistent with Washington's law or

13   practice respecting the provision of public education. Plaintiffs are therefore not entitled to a

14   preliminary injunction.

15   **C.    Irreparable Harm**

16   Plaintiffs argue that the Court erred in finding that they had not met their burden of

17   demonstrating a likelihood of irreparable harm. *See generally* Dkt. No. 60. Specifically, they argue

18   that "the Court manifestly erred (1) in failing to recognize that a denial of a free appropriate public

19   education ("FAPE") *by itself* is irreparable harm as a matter of law," and (2) because it "overlooked

20   evidence in the record specifically showing that E.A. *will* regress even from a *planned* termination

21   of his services." *Id.* at 1 (emphasis original). Plaintiffs' assertions assume that they have

22   demonstrated a likelihood of success on the merits of their claim that their education services were

23   terminated in violation of the IDEA, but as set forth above, they have not done so. As other courts

24   in this district have recognized, the likelihood of irreparable harm is "intimately tied to [plaintiff]'s

likelihood of success on the merits." *Miller v. Monroe Sch. Dist.*, 131 F. Supp. 3d 1107, 1117 (W.D. Wash. 2015) ("Without demonstrating [likelihood of success on the merits of plaintiff's claim that the district denied him a FAPE], [plaintiff] cannot show . . . that there is a likelihood of irreparable injury"); *see also Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) (holding that the district court did not abuse its discretion in finding that plaintiff had not shown a likelihood of irreparable harm based on a loss of constitutional rights when plaintiff did not show a likelihood of success on the merits of that claim). For this reason, various courts have held that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm (to the extent such presumption would otherwise be available). *See, e.g.*, *Hernandez v. Grisham*, 494 F. Supp. 3d 1044, 1122 (D.N.M. 2020); *Aliah K. ex rel. Loretta M. v. Hawaii, Dep't of Educ.*, 788 F. Supp. 2d 1176, 1194–95 (D. Haw. 2011); *accord C.C. By & Through Ciriacks v. Cypress Sch. Dist.*, No. SACV11-352AG(MLGx), 2011 WL 13130855, at *6 (C.D. Cal. June 13, 2011) (citing *Silver Sage Partners v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992); and *Smallwood v. Nat'l Can Co.*, 583 F.2d 419, 420 (9th Cir. 1978)).

Even if Plaintiffs had established a likelihood of success on the merits, they have not demonstrated a likelihood of irreparable harm. Applying the traditional four-factor test, Plaintiffs bear the burden of demonstrating that they are "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter*, 555 U.S. at 20. The "possibility" of irreparable harm is insufficient; Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis original).

Plaintiffs have not met their burden, and their motion for reconsideration does not demonstrate manifest error. Although Plaintiffs submitted specific evidence regarding the possible harm to E.A., Dkt. No. 35-1, they presented no evidence from which the court can conclude that

this harm is typical and common to the provisional class. With respect to that class, Plaintiffs attempt to show a likelihood of irreparable harm by relying on a presumption of harm, a journal article regarding COVID-19 related school shutdowns, and speculation regarding the class without considering the effects of transition services or compensatory education. This is not sufficient to carry their burden. The Court examines their evidence and assertions in turn.

Plaintiffs' argument that withdrawing special education services "*necessarily* results in irreparable harm" relies on an inapplicable presumption of harm. Dkt. No. 60 at 1 (emphasis original). Plaintiffs rely on cases that mostly predate *Winter*, Dkt. No. 60 at 1–2, but more recent Supreme Court authority has "consistently rejected invitations to replace traditional equitable considerations" with presumptions or categorical rules. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–93 (2006); *see also Hooks ex rel. NLRB v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1115 (9th Cir. 2022) (explaining that the Supreme Court has "reject[ed] presumptions" of irreparable harm); *P.G. by & through Mallory v. City of Long Beach*, No. CV 17-8663 DSF (SKx), 2019 WL 2009110, at *1 (C.D. Cal. May 6, 2019) (a "presumption of irreparable harm [where a defendant is alleged to have violated a student's IEP] conflicts with the Supreme Court's holding in *Winter*"). Instead of allowing presumptions of harm, the Supreme Court has made clear that when an injunction is sought, no "thumb on the scales is warranted" and courts "must determine that an injunction should issue under the traditional four-factor test" for injunctive relief. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010) (emphasis omitted).

Although Plaintiffs rely on *N.D. ex rel. Parents Acting as Guardians Ad Litem v. Hawaii Department of Education*, to support a presumption of harm, Dkt. No. 60 at 1, the court in *N.D.* applied no such presumption. 600 F.3d 1104 (9th Cir. 2010). Nor did it hold that all disruptions of individualized education programs cause irreparable injury. Instead, the court in *N.D.* examined the evidence the plaintiffs submitted "detailing the injuries" that students had experienced from

the same ongoing practice they were then challenging. *Id.* at 1112. In other cases Plaintiffs cite, courts similarly examined case-specific evidence when evaluating irreparable harm. *See S.M. by & through Michael C. v. Chichester Sch. Dist.*, No. 21-4266, 2022 WL 875232, at *3–4 (E.D. Pa. Mar. 24, 2022) (noting that "[n]umerous courts have found that denial of a FAPE automatically constitutes irreparable injury," but proceeding to evaluate whether the case-specific evidence showed irreparable harm), *clarified on denial of reconsideration*, No. 21-4266, 2022 WL 2134165 (E.D. Pa. June 14, 2022); *B.T. v. Dep't of Educ.*, No. 08-00356-DAE-BMK, 2008 WL 3891867, at *6–7 (D. Haw. Aug. 21, 2008); *Massey v. Dist. of Columbia*, 400 F. Supp. 2d 66, 75 (D.D.C. 2005).[12]

Nor did *N.D.*, *S.M.*, *B.T.*, or *Massey* address compensatory education or whether it could remedy a deprivation of a FAPE, especially where students are in their final year.[13] Courts have explained that compensatory education is designed to "make up for educational services the child should have received in the first place, and aims to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011) (cleaned up). And as Defendants note, "[c]ourts routinely award compensatory education for that very purpose." Dkt. No. 66 at 4 (citing *R.P. ex rel. C.P.*, 631 F.3d at 1126). Courts can be "creative" in using their equitable powers

---

[12] The other cases Plaintiffs cite are similarly inapposite. *Honig v. Doe* addressed the statutory stay-put provision that creates a presumption in favor of maintaining the student's current placement when a school district challenges a stay-put order; in that circumstance, "the burden rests with the school district to demonstrate that the educational status quo must be altered." 484 U.S. 305, 328 n.10 (1988). The stay-put provision is not at issue in this motion. Nor is an alleged "failure to provide a timely due process hearing" at issue in this case like it was in *Blackman v. Dist. of Columbia*, 277 F. Supp. 2d 71, 80 (D.D.C. 2003).

[13] The court in *Cosgrove* addressed compensatory education and found that the plaintiff established irreparable harm based on the specific facts and evidence presented. *Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392–393 (N.D.N.Y. 2001). As in *Honig*, the case involved an alleged violation of the stay-put provision, and "[t]he Second Circuit has described Section 1415(j) [the stay-put provision] as an 'automatic preliminary injunction' which 'substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships.'" *Id.* at 383–84 (quoting *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)).

"in fashioning the amount and type of compensatory education services to award." *R.P. ex rel. C.P.*, 631 F.3d at 1126. Acknowledging the availability and utility of that remedy, Plaintiffs' amended complaint seeks compensatory education for the named Plaintiffs and members of the putative class "to the extent they have already been unlawfully denied a FAPE[.]" Dkt. No. 31 at 14.

Plaintiffs did not submit any evidence to show that compensatory education would be insufficient to remedy their anticipated harms. E.A.'s mother stated in a declaration that once E.A. is exited from special education, she has "no doubt that E.A. will experience something similar" to what he experienced due to COVID-19 school closures. Dkt. No. 35-1 at 3. But her declaration does not address the putative class, nor does it address compensatory education. It also notes that "months of services" returned E.A. "to where he had been emotionally, behaviorally, and academically" before the closures. *Id.*[14] As the Court previously found, there is no evidence in the record regarding "whether compensatory education services, if later granted, would be sufficient to remedy" any anticipated harms, and a speculative injury is insufficient to demonstrate a likelihood of irreparable harm. Dkt. No. 58 at 19;  *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *M.N. v. Sparta Twp. Bd. of Educ.*, No. 21-19977, 2022 WL 1093667, at *12

---

[14] Plaintiffs also argue for the first time that E.A.'s extended year services are "only available to students who, in the absence of continuous educational services (such as during planned school breaks over the summer), experience 'regression[.]'" Dkt. No. 60 at 3. The Court does not consider new arguments that could "have been brought to [the Court's] attention earlier with reasonable diligence." LCR 7(h)(1); *Kona Enters., Inc.*, 229 F.3d at 890 (explaining that a motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." (emphasis omitted)). Regardless, Plaintiffs' new argument does not address whether E.A.'s situation is representative of the putative class, nor does it address the availability or efficacy of compensatory education. It therefore does not alter the result.

(D.N.J. Apr. 12, 2022) ("In light of the particular facts of this case, the Court agrees with the [defendant] that the availability of compensatory education defeats Plaintiffs' contention that [plaintiff] will suffer irreparable harm without an injunction."); *L.Y. ex rel. J.Y. v. Bayonne Bd. of Educ.*, No. 09-4422 (SRC), 2009 WL 2998153, at *6 (D.N.J. Sept. 15, 2009) (finding that the availability of compensatory education "belies Plaintiff's argument that [Plaintiff] will suffer irreparable harm"), *aff'd*, 384 F. App'x 58 (3d Cir. 2010).

Finally, Plaintiffs contend that the Court erred in stating that transition services are offered to students "after their IEP services end," Dkt. No. 58 at 18, because transition services are unavailable once a student ages out, Dkt. No. 60 at 4. Plaintiffs are correct. As Defendants explain, transition *recovery* services were available to students over the age of 21 until the end of the 2022-2023 school year in certain circumstances, but transition services are unavailable after a student ages out. Dkt. No. 66 at 5 n.1; *see also* Dkt. No. 55-1 at 8–9; Dkt. No. 55-2. However, the thrust of the Order's point regarding transition services remains true: Plaintiffs contend that all students who exit special education services before turning 22 automatically suffer irreparable harm, Dkt. No. 35 at 22–23; Dkt. No. 60 at 1, but that argument ignores the potential impact of transition services designed to mitigate any potential harm from the end of their schooling, Dkt. No. 38 at 3–4; Dkt. No. 39 at 2–3. *See also* 20 U.S.C. § 1401(34) ("transition services" are "designed to . . . facilitate the child's movement from school to post-school activities . . . based on the individual child's needs," and include "instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation."). The Court also observes that E.A.'s June 12, 2023 IEP notes state that his last extended school year (summer) program was a "solely transition program," Dkt. No. 46 at 34, which came on the heels of E.A.'s parents' "refus[al] to consider transition services" for "several years," Dkt. No. 39 at 3. *See also* Dkt. No.

46 at 36 (although E.A. "still needs additional FAPE beyond the ESY summer 2023 to work on transition goals," "he will work on beginning transition goals during ESY summer 2023"); Dkt. No. 49 at 2.

Plaintiffs' reliance on an education journal article discussing the harm to students from COVID-19 related school shutdowns also fails to consider the effects of compensatory education or transition services. Dkt. No. 35 at 23 n.4 (citing HM Genova *et al.*, *Effects of School Closures Resulting From COVID-19 in Autistic and Neurotypical Children*, Front. Educ. 6:761485 (Nov. 23, 2021), https://www.frontiersin.org/-articles/10.3389/feduc.2021.761485/full). Nor have Plaintiffs established that the journal article's findings apply to the provisional class, especially considering that the proposed provisional class includes only those students in their final year of education who would have received transition services as appropriate in the year(s) before their exit, rather than an abrupt cessation of education services as occurred with COVID-19. Dkt. No. 35-6 at 1–2.

Accordingly, Plaintiffs have not demonstrated that the Court erred in concluding that they have not met their burden of demonstrating a likelihood of irreparable harm absent an injunction.

**D.    The Balance of Equities and the Public Interest**

Under the remaining two factors, the Court considers whether the balance of equities tips in Plaintiffs' favor and whether an injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). In examining the balance of the equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated in part on other grounds by Winter*, 555 U.S. 7. However, "when the

government is a party, these last two factors merge[.]" *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (cleaned up).

Plaintiffs are correct that "compliance with the law is in the public interest[.]" *N.D.*, 600 F.3d at 1113; Dkt. No. 35 at 23–24. But as set forth above, Plaintiffs have not met their burden to demonstrate a likelihood that Defendants are violating the IDEA, so that argument does not establish that these factors weigh in their favor.

Plaintiffs also argue that an injunction would impose a minimal burden on Defendants because it simply requires Defendants to maintain the status quo, *id.* at 23, but that was untrue when the Court issued its Order and remains untrue now, Dkt. No. 58 at 16–17; Dkt. No. 60 at 4. Plaintiffs previously sought an order enjoining Defendants "from allowing any LEA subject to their supervision to terminate IEP services for any member of said provisionally certified class by reason of said class member's age prior to said class member having reached age twenty-two," and requiring them "to take all actions necessary to ensure that each said class member to whom the Court's injunction extends continues to receive IEP services until the earlier of the resolution of this litigation or said class member reaches the age of twenty-two." Dkt. No. 35-6 at 1–2. Plaintiffs' motion for reconsideration asks the Court to "enter a preliminary injunction requiring all proposed provisional class members to be reinstated immediately to special education placements from which they were exited on August 31." Dkt. No. 60 at 4. These requests show that Plaintiffs are not simply seeking to maintain the status quo as of "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); *N.D.*, 600 F.3d at 1112 n. 6. As the Court previously found and as the record shows, the injunction Plaintiffs seek would require the school districts to reverse course from a long planned wrapping up of education services to extending services and engaging in additional planning and hiring. Dkt. No. 39 at 2 (three students in the Selah School

District, including E.A., will exit the district due to graduation or aging out; continuing to provide services to them for the upcoming school year would require hiring "at least two additional paraeducators"); Dkt. No. 38 at 4–5 ("Students' IEP teams have spent years preparing students to transition to post-school adulthood in their 21st year," including "significant collaboration and planning with outside agencies and organizations," and if the district were required to provide special education services to 43 students for another year, it would need to hire at least five more special education teachers, eight instructional assistants, and five additional classrooms, all at a cost that was not budgeted for); *see also Keener v. Rancho Simi Recreation & Park Dist.*, No. CV17-9182-GW(KS), 2018 WL 6137125, at *4 (C.D. Cal. Mar. 13, 2018) (plaintiff was seeking a mandatory injunction by seeking an order precluding defendant from continuing its existing policy). However, regardless of whether the injunction is mandatory or instead preserves the status quo, the Court would reach the same result.

Plaintiffs also contend that the balance of equities and public interest factors weigh in their favor because they are likely to suffer irreparable harm if injunctive relief is not granted. Dkt. No. 35 at 23. As the Court previously stated, although the Court is sympathetic to the harms E.A. suffered from the COVID-19 related school closures and his mother's fear that the harms could reoccur when his services end, the facts currently in the record do not demonstrate a likelihood of irreparable harm. Dkt. No. 58 at 18.

For their part, Defendants argue that the factors weigh in their favor because "Plaintiffs' proposed mandatory preliminary injunction would cause incredible disruption and chaos to school districts[.]" Dkt. No. 36 at 17. Specifically, "[a] preliminary injunction would disrupt the plans and budgets of school districts across the state, which have been in place for months, causing severe hardship on the districts and the students they serve." *Id.* If special education services were required through age 22, "the costs of hiring out-of-area service providers or contracting out the

services would be significant and would require significant reallocation of the District's budget," potentially resulting in "a severe negative impact on the quality of both general and special education that the district is able to provide." Dkt. No. 39 at 3. For example, in the Selah School District, three students (including E.A.) who were receiving IEP services have exited, and if the school were required to continue their services, they "would need to hire at least two additional paraeducators; but the hiring season for paraeducators has passed, and there is a limited current applicant pool." *Id.* at 2. As for Defendants' budgetary concerns, although "[t]he public interest in protecting the limited budgets of school districts" usually "does not outweigh the public's interest in seeing that disabled children are educated," *R.F. by Frankel v. Delano Union Sch. Dist.*, 224 F. Supp. 3d 979, 991 (E.D. Cal. 2016), here Defendants' concerns are not merely budgetary but extend to systemic disruptions and detrimental effects on the quality of education for all students, which weigh against an injunction.[15] The Court may consider such systemic issues when evaluating the public interest. *R.F.*, 224 F. Supp. 3d at 991 ("[C]ourts have found the public interest to not favor a stay-put injunction primarily in cases where a district-wide policy change is at issue rather than the impact of a single student requiring additional services."); *N.D.*, 600 F.3d at 1113 (finding that the public interest did not particularly favor disabled students where the district faced potentially increased class sizes as a result of layoffs if it did not implement furloughs); *Smith v. Henderson*, 944 F. Supp. 2d 89, 108 (D.D.C. 2013) (public interest favored school district where injunction would "wreak havoc" on the eve of school closure by injecting uncertainty regarding

---

[15] Plaintiffs argue that Defendants' assertion "that changing plans would place an undue hardship on the districts is belied by the fact that a 'stay put' order requiring continuation of current educational placements is the norm 'during the pendency of any proceedings' to enforce IDEA rights," Dkt. No. 42 at 16 (quoting *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1038 (9th Cir. 2009)), but stay-put injunctions are not available as class-wide relief, *see Roe v. Baker*, 624 F. Supp. 3d 52, 60 n.6 (D. Mass. 2022), *aff'd sub nom. Roe v. Healey*, 78 F.4th 11 (1st Cir. 2023). *See also J.T. v. de Blasio*, 500 F. Supp. 3d 137, 185 (S.D.N.Y. 2020); *V.D. v. State*, 403 F. Supp. 3d 76, 91 n.8 (E.D.N.Y. 2019).

1   "whether [schools] will have students in the fall and, if so, who and how many," "if and where

2   [teachers] will have jobs," and "where [families'] children will attend school.").

3          Based on the current record, Plaintiffs have not shown that the balance of equities tips in

4   their favor or that an injunction is in the public interest given their failure to establish a likelihood

5   of success or irreparable harm, the difficulty of providing the relief Plaintiffs seek on short notice,

6   the disruption it would cause the school districts, and the resources that would have to be diverted

7   at the last minute, potentially to the detriment of the quality of education for all students. Dkt. No.

8   36 at 17–18; *see also* Dkt. No. 39 at 2–3; Dkt. No. 40 at 5.

## III.   CONCLUSION

10         For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART

11  Plaintiff's motion for reconsideration. Dkt. No. 60. The Court has thoroughly reconsidered its

12  decision, but ultimately reaches the same result.

14         Dated this 29th day of September, 2023.

Lauren King
United States District Judge